[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 09-11149
Non-Argument Calendar

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
Dec. 04, 2009
THOMAS K. KAHN
CLERK

D.C. Docket No. 07-00340-CV-FTM-34DNF

PETER F. SUTTON,

Plaintiff-Appellant,

versus

COUNTRYWIDE HOME LOANS, INC.,
a foreign for profit corporation,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(December 4, 2009)

Before CARNES, MARCUS and COX, Circuit Judges.

PER CURIAM:

Peter F. Sutton appeals the grant of summary judgment to Countrywide Home Loans, Inc. on Sutton's claims under the Real Estate Settlement Procedures Act ("Real Estate Act"), 12 U.S.C. § 2607. We affirm.

Sutton owned a home subject to two mortgages, but his only source of income was a $1,080 monthly social security benefit. He desired to reduce his mortgage payments, which exceeded $1,400 per month. So, he sought help from a mortgage broker with Apex Mortgage Services to obtain a refinance loan. During a telephone conversation with Sutton, the broker took down information for a loan application, and then he shopped the loan application to several lenders. According to Sutton, the broker led him to believe that he could receive, from Countrywide, a refinance loan with payments of $428 per month. The broker, however, ultimately arranged for Sutton an adjustable rate loan with Countrywide requiring monthly payments starting at over $1,000 per month and subject to further increases. Sutton signed forms stating he agreed to the terms of the loan arranged by the Apex broker. He claims, however, that he did not understand the terms of the loan until after closing. As compensation for brokering Sutton's loan, Countrywide paid Apex $7,270. This payment included a "yield spread premium" of $4,710, which is a payment made in exchange for the broker delivering a mortgage above the "par rate" being offered by the lender.

Sutton alleges that in applying for this loan on Sutton's behalf, the broker committed a variety of acts that were "wrongful, fraudulent, and predatory." (Appellant's Br. at 13.) For example, the broker reported on the loan application that Sutton earned a monthly salary of $4,500 even though Sutton informed the broker that his actual income was about one-fourth that amount. Also, Sutton's existing mortgage had a prepayment penalty, and the broker did not notify Sutton of this fact.

Sutton filed suit against Countrywide in Hendry County, Florida Circuit Court alleging a violation of the Real Estate Act. He also brought state law claims for deceptive trade practices, fraud, and elder abuse. Countrywide removed the case to the United States District Court for the Middle District of Florida, invoking federal question and diversity jurisdiction. Sutton then amended his complaint to add Apex as a defendant. But, Apex is apparently no longer in business, and it did not make an appearance to defend the lawsuit. A default was entered against Apex, and Sutton ultimately dismissed with prejudice all claims against it.[1]

---

[1] When Sutton filed his notice of appeal, no judgment had been entered against Apex, but only an entry of default. We ordered supplemental briefing to address whether there was a final judgment as to all parties to this action. We do not construe the district court's order of January 29, 2009 to remand any federal claims against Apex to the Florida Circuit Court. Sutton has now filed a voluntary notice of dismissal with prejudice of his claims against Apex. The dismissal of Apex cured any jurisdictional defect that would have prevented our review of the merits of this appeal. *See Kramer v. Unitas*, 831 F.2d 994, 997 (11th Cir. 1987).

Countrywide moved for summary judgment, which the court granted as to the Real Estate Act claim. The court summarized Sutton's theory of the case as arguing that "because Apex allegedly did bad things in assisting Sutton with his refinancing, Countrywide should not have paid Apex any yield spread premium." (R.4-95 at 4.) It held that because Sutton presented no evidence Countrywide colluded with Apex, or knew or should have known that Apex did "bad things" in brokering the loan, there were no genuine issues of material fact. The court granted Countrywide summary judgment for the Real Estate Act claim and declined to maintain supplemental jurisdiction over the remaining state claims. Sutton appeals the entry of summary judgment for the Real Estate Act claim.

The Real Estate Act proscribes the payment of kickbacks and unearned fees in association with mortgage lending. A payment by a lender to a mortgage broker violates the anti-kickback provisions of the Act when it is made solely in exchange for a referral of business. A payment does not violate the Act if it bears a reasonable relationship to goods or services actually provided or performed by the broker. 12 U.S.C. § 2607(c).

This case involves a yield spread premium. The lowest interest rate at which a lender will make loans without charging a borrower additional up-front fees is commonly referred to as the par rate. If a broker arranges a loan with an interest rate

below the par rate, the lender generally requires the broker to pay discount points; these costs are passed along to the borrower. In contrast, if a broker arranges a loan with an interest rate above the par rate, the lender pays the broker a yield spread premium. This payment is often passed along, in part, to the borrower in the form of reduced loan closing costs. *See e.g. Culpepper v. Inland Mortg. Corp.*, 132 F.3d 692, 694 (11th Cir. 1998) (describing yield spread premiums). In this case, Countrywide paid Apex a yield spread premium of $4,710, and Sutton paid no cash at closing. (R.2-49, Ex. 4.)

We apply a two-step test to consider whether a yield spread premium violates the anti-kickback provisions of the Real Estate Act.

> First, we ask whether the broker performed "actual services" in the course of arranging the mortgage transaction . . . . If the answer to the first question is no, then a [Real Estate Act] violation has been established. If the answer to the first question is yes, we then proceed to ask whether the total compensation was reasonable in light of the total array of services that the broker performed.

*Culpepper v. Irwin Mortg. Corp.*, 491 F.3d 1260, 1273 (11th Cir. 2007) (citations omitted) (applying test set forth in Department of Housing and Urban Development statement of policy). Sutton argues that Apex's acts should not count as "actual services" for purposes of this analysis because they were undertaken as part of a scheme to defraud Sutton by misrepresenting his financial capacity to Countrywide

5

and arranging for him an "unsuitable loan." (Appellant's Reply Br. at 9.) Because Apex provided no "actual services," Sutton argues, any yield spread premium payment to Apex violated the Real Estate Act under step one of the test. Sutton also contends that even if Apex is found to have offered "actual services," the compensation was unreasonable under step two of the test because the "total array of services" that Apex performed was of no value to Sutton in that he was left with a loan he could not afford. We reject these arguments.

The Real Estate Act's anti-kickback provisions forbid lenders from compensating brokers for referrals. These provisions are not the appropriate vehicle for considering globally—as Sutton would have us do—whether a broker provided fair, honest, and competent service to a borrower. Instead, we consider whether the broker performed *actual* brokerage services; whether it completed tasks or provided goods related to the arrangement of a mortgage that warrant payment from the lender or borrower. If so, we ask if any payment bears "a reasonable relationship to the value received *by the person or company making the payment*." Real Estate Settlement Procedures Act Statement of Policy 1999-1 Regarding Lender Payments to Mortgage Brokers, 64 Fed. Reg. 10080, 10086 (March 1, 1999) (emphasis added). In arranging Sutton's loan, it is undisputed Apex actually completed tasks commonly performed in the origination of a loan. *See id.* at 10085 (listing common loan

origination services). Because Apex performed tasks to further the processing and origination of the loan, Countrywide received value from Apex's services. So, its payment to Apex was not a kickback or unearned fee under step one of our analysis. As to step two, Sutton presents no evidence that Countrywide's payment to Apex was an unreasonably high sum for the types of services Apex performed. Therefore, the yield spread premium in this case satisfies both prongs of the test.

Whether or not Apex acted out of its own self interest to arrange a loan with unfavorable terms for Sutton, this does not negate the fact that Apex performed "actual services" in brokering the loan.[2] Nor does it cause an otherwise reasonable fee for these services to violate the anti-kickback provisions of the Real Estate Act. Because Apex provided "actual services" in arranging Sutton's loan and because the total compensation paid to Apex was not unreasonable, Countrywide's payment did not violate the Real Estate Act.

## CONCLUSION

For the foregoing reasons, we affirm the judgment.

AFFIRMED.

---

[2]The district court's opinion includes an implicit finding that the yield spread premium in this case was not unreasonably high. The court also held Sutton presented no evidence that Countrywide colluded with or knew of Apex's alleged misconduct in arranging Sutton's loan. (R.4-95 at 4). We conclude that Sutton has not presented sufficient evidence to show that Countrywide knew or should have known of any acts taken by Apex that could give rise to a colorable claim of fraud. Therefore, we do not consider whether Countrywide would have violated the anti-kickback provisions of the Real Estate Act had it colluded with Apex to arrange an unfavorable loan for Sutton.